THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LLOYD R. DAVIS, Defendant-Appellant.

Second District    No. 2—92—1070

Opinion filed March 25, 1994.—Rehearing denied April 28, 1994.

Thomas A. Briscoe, of Will & Briscoe, Ltd., of Waukegan (Robert P. Will, Jr., of counsel), for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers

178

and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

After a bench trial, defendant, Lloyd R. Davis, was convicted of 5 counts of criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(4) (now 720 ILCS 5/12—13(a)(4) (West 1992))), 10 counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, pars. 12—16(d), (f) (now 720 ILCS 5/12—16(d), (f) (West 1992))), and 9 counts of child pornography (Ill. Rev. Stat. 1991, ch. 38, pars. 11—20.1(a)(3), (a)(4), (a)(5) (now 720 ILCS 5/11—20.1(a)(3), (a)(4), (a)(5) (West 1992))). The trial court sentenced defendant to consecutive sentences totaling 31 years in the Department of Corrections. Defendant appeals, alleging (1) that the State failed to prove him guilty beyond a reasonable doubt, (2) that the trial court erred in allowing "other acts" testimony, (3) that the trial court erred in finding that defendant produced a live performance of child pornography involving a minor, and (4) that the trial court abused its discretion in sentencing defendant. We affirm in part and reverse in part.

Defendant is the head pastor or "bishop" of the Christian Fellowship Church (Church), which is based in Waukegan, Illinois, and has several branches worldwide, including San Diego, California; Norfolk, Virginia; and Tijuana, Mexico. A Lake County indictment alleged that defendant participated in various forms of sexual activity with two minors, A.C. and C.L., while both minors were members of the Church. Defendant waived a jury trial and his bench trial commenced on June 22, 1992.

A.C. testified at trial that he was born June 24, 1974, in Los Angeles, California. In July 1987, A.C. was selling goods on Revolucion Avenue in Tijuana, Mexico, when he was approached by defendant, Scott Morehouse, Chuck Thompson, David Armstrong, and other members of the Church. Defendant and the others talked to A.C. about their church and took him to lunch. A.C. made plans with defendant's group to be baptized at the San Diego branch of the Church. A.C. then returned to work.

A.C. became friends with another boy named C.L., who also worked on Revolucion Avenue. C.L. had already been baptized in the Church. A.C. and C.L. eventually crossed the border to visit the Church in San Diego, where A.C. was then baptized. A.C. moved up to San Diego during the summer of 1987 to live in a house owned by the Church. A.C. lived in the Church house and attended school until the spring of 1988.

Defendant visited the Church in San Diego a few times during

this period. A.C. testified that defendant would call A.C. into his office and ask him if he masturbated. Defendant told A.C. that masturbation was not a sin because it kept one from having sex with women and fornication was a bad sin. Defendant would often hold A.C.'s leg close to the knee. A.C. said that defendant grabbed A.C.'s crotch while they were at a hotel in San Diego. A.C. said he thought defendant was testing him.

Defendant asked A.C. if he wanted to visit the "mother Church" in Chicago. A.C. said he wanted to go because he thought he was doing a "good thing for God" and he felt privileged that defendant had asked him. A.C. came to Waukegan in the summer of 1988. A.C. stayed at the Church office on O'Plaine Road in Waukegan. Defendant continued to talk to A.C. about sexual matters. Defendant asked A.C. if he would like to visit the Church in Norfolk, Virginia. A.C. said yes because he thought it would be a privilege. Defendant then asked A.C. if he wanted to masturbate with him. When A.C. did not respond, defendant pulled A.C. over to a couch, pulled A.C.'s pants down, and stroked A.C.'s penis. Defendant then performed fellatio on A.C. After A.C. ejaculated, defendant gave him a paper towel from his desk and said "God forgive me." Defendant then took A.C. to a store and bought him a watch.

A day or two later defendant called A.C. to his office again. Defendant took his clothes off and produced a large pillow from the closet which he put on the floor. Defendant and A.C. then sat on the pillow. Defendant had A.C. hold defendant's penis and defendant performed fellatio on A.C. again. On the third occasion, defendant brought another minister, Chuck Thompson, up to the office with A.C. Defendant was lying on the large pillow on the floor in his underwear. He repeatedly grabbed for A.C.'s buttocks and crotch in front of Chuck Thompson but A.C. became upset and left the room.

On another occasion A.C. was in the office with defendant lying on the ground. Defendant again performed fellatio on A.C. and then got Vaseline lotion and paper towels out from his desk drawer. Defendant put the Vaseline on his anus and gave A.C. some to rub on his penis. Defendant instructed A.C. to perform anal sex on defendant but A.C. was unable to finish because defendant said it hurt him. Defendant told A.C. to put his knees on a chair facing the back of the chair. Defendant then applied more Vaseline onto A.C.'s anus and performed anal sex on A.C.

Defendant's sexual acts with A.C. continued during the summer. A.C. also had sex with other members of the Church many times. Defendant was always present when this occurred. A.C. said it was defendant's idea that A.C. have sex with Michael Carner, another

Church member. Defendant told Carner to perform oral sex on A.C. while defendant watched and masturbated. Carner also performed fellatio on defendant. On another occasion defendant instructed David Armstrong, another Church member, to perform fellatio on A.C. while A.C. did the same to Armstrong. Defendant then performed oral sex on A.C.

A.C. testified that defendant performed sexual acts with him at the "mother Church" on Belvidere Road in Waukegan during the summer of 1988. One incident involved A.C., defendant, and another man whose name A.C. could not recall. The three men each performed oral sex on one another in the Church office.

A.C. said that there were many incidents when several men were present for sexual acts with A.C. and defendant. A.C. recalled one occasion when seven or eight men were in the office on O'Plaine Road. Defendant controlled the situation and would direct the people as to what he wanted them to do sexually. A.C. described the scene as a "big naked party."

A.C. traveled to Norfolk with defendant during the summer of 1988. A.C. testified that several sexual episodes occurred during this trip. On one occasion, defendant directed A.C. to apply Vaseline and perform anal sex on Daniel Lantis, the pastor at the Church in San Diego. Defendant watched and masturbated during this time.

Defendant told A.C. that homosexuality was a sin, but the acts they were performing were no different than masturbation and were not sinful if there was no lust between the men. A.C. testified that defendant wore a wig and has false teeth. He said defendant wore white brief-type underwear. A.C. recalled that defendant was uncircumcised and had white and brown pubic hair. He also noted that defendant had a purplish rash around his inner thigh and white spots on his legs. Defendant never wore a condom. Defendant would say, "I'm going to get ya" when he referred to anal sex.

A.C. returned to San Diego in September 1988. Defendant would occasionally visit and perform sexual acts with A.C. at the Royal Vista Hotel in San Diego. One incident involved defendant and Armstrong. Other incidents occurred at the Church-owned home on Oceanview Boulevard in San Diego. On one occasion A.C. attempted to have anal sex with defendant. A.C. admitted he also had oral sex with Vernon Engler, another Church member, when defendant was not present.

A.C. thought about leaving the Church sometime in 1989. When A.C. told defendant of his intentions, defendant said "God, I pray you take this sole [sic] or man off the earth." Some members of the Church told A.C. to write a letter stating that there was no homosexual

activity going on in the Church. A.C. refused at first but after speaking with defendant he finally acquiesced. A.C. signed the letter, stating therein that he had not been forced to write the letter. A.C. also made an audio tape stating he did not witness any homosexual activity among the Church members.

A.C. returned to his house in Mexico and told several people about the sexual incidents with defendant. C.L. informed A.C. that similar acts had happened to him. C.L. told A.C. that he was going to talk to Wayne Chumbley, an agent with the Immigration and Naturalization Service (INS) in San Diego. A.C. decided to go too. A.C. said he revealed to Chumbley all the sexual incidents that were going on in the church. A.C. also gave statements to Wayne Maxey of the San Diego district attorney's office and to personnel at the San Diego Children's Hospital.

A.C. denied that Cecelia Fergosa, a friend of A.C. and a former member of the Church, told him and C.L. that they could gain money if they accused defendant of sexual acts. A.C. testified that it was his uncle's idea to file a civil suit in California based on the sexual acts defendant performed with A.C.

At trial, A.C. was shown a paper with his signature stating that he would not testify against the Church. A.C. said he wrote this because C.L. was threatening him and trying to get A.C. to stop accusing the church. C.L. had recanted his allegations against the Church and maintained that everything he said previously was untrue. C.L. also offered A.C. money to make a videotape in which they would both recant their previous testimony against the Church and declare that they had made the accusations for money. A.C. indicated he suffered from bleeding in his anal area but he did not know if it was in any way related to the sexual acts with defendant.

Scott Morehouse testified that he joined the Navy and was stationed at Great Lakes Naval Base (Great Lakes) in Waukegan during January 1979. He soon became a regular visitor at the Church's Serviceman's Center near Great Lakes which was where he came to know defendant. Morehouse talked with defendant about opening a branch of the Church in Norfolk, where Morehouse was to be transferred with the Navy.

Defendant visited Morehouse in Norfolk several times while Morehouse was still involved in the Navy. Defendant began making references that he wanted to have sexual encounters with Morehouse. Defendant often talked about masturbation and said it was a natural act. Defendant and Morehouse later engaged in sexual acts in a hotel room in Norfolk. During defendant's next visit six months later, he and Morehouse engaged in sexual acts on several occasions.

These instances involved anal sex between defendant and Morehouse. On one occasion, three other men were present and participated in sexual activity. Defendant would direct the men as to the sexual acts they were to perform on each other. Defendant used Vaseline petroleum jelly and paper towels to clean up afterwards.

After Morehouse was discharged from the Navy, he became completely involved with the Church. During a visit to the Church in Waukegan, Morehouse engaged in sexual acts with defendant in his Church office. Defendant would inquire if Morehouse "wanted to engage" or would ask "[i]s it okay if I get ya?" Defendant would typically use a large cushion placed on the floor for sexual acts. Defendant reassured Morehouse that homosexual acts were not wrong as long as it was just a "physical release" and you did not love the man as a wife.

From 1983 to 1989, Morehouse served as pastor at the Church in San Diego. He also had oral sex with defendant at the Church office in San Diego on Saipan Avenue. Morehouse testified that defendant had a hairpiece and wore dentures. Defendant wore white brief underwear, was uncircumcised, and had gray pubic hair. Morehouse also noticed a scar below the beltline on defendant's back.

Morehouse testified that defendant directed him to recruit young Latino men along Revolucion Boulevard in Tijuana. Defendant said he wanted to train men to carry the word of God back to Mexico. Defendant told Morehouse to work with the boys and try to get them to come up to services in San Diego. Morehouse specifically recalled approaching A.C. Defendant wanted Morehouse to recruit A.C. and get him up to San Diego. Morehouse said defendant showed A.C. much attention and always kept A.C. near him during prayer meetings. Morehouse never observed sexual activity between defendant and A.C. either in San Diego or Waukegan.

Morehouse decided to leave the Church in 1989. He felt that the sexual activity with defendant was wrong and he also suspected that defendant had had sexual relations with C.L. After Morehouse left the church, he wrote a letter saying he respected defendant and appreciated him as his pastor. Morehouse admitted that he told United Press International, at defendant's direction, that no homosexual activity took place in the Church. Morehouse said he spoke with Chumbley regarding A.C. and C.L. Morehouse said he had an idea that defendant was abusing the boys because of prior conversations with A.C. and C.L. in 1989.

Joseph Bryon testified that he was in the Navy in Norfolk when he met defendant in December 1980. Bryon was discharged from the Navy in 1982 and moved to Waukegan because he hoped to advance

in the Church. In July 1983, Bryon was at the Karcher Hotel in Waukegan when defendant approached him, grabbed his buttocks, and asked "[w]hen are you going to let me get you right there?" Several days later defendant summoned Bryon to his office. When Bryon entered the office he found defendant lying on the floor nude. Defendant removed lotion and paper towels from his desk and told Bryon it was acceptable to relieve tension in this manner. Upon defendant's instruction, Bryon performed anal intercourse on defendant. Defendant then asked Bryon to lean on a chair while defendant tried unsuccessfully to perform anal intercourse on Bryon.

Bryon had sexual relations with defendant on one occasion when Dick Brand, another Church member, was present. Bryon said defendant wore white briefs and had a hairpiece. Bryon left the Church in 1986, indicating he had lost faith in the Church. Defendant told him to leave the Church which, according to the Church doctrine, meant Bryon was going to hell.

Randall Sorenson testified that he met defendant through his brother, Rick Sorenson, who joined the church in 1975. Randall testified that in 1978 he moved into the Karcher Hotel in Waukegan with other Church members. He had previously been stationed at Great Lakes. Randall spent a lot of time at the Church's Servicemen's Center, located across the street from Great Lakes.

Defendant told Randall that sex between two men was not homosexuality if there was no love involved; rather, the act itself was just masturbation. Defendant would often talk about sex and ask Randall "[w]hat if I get ya?" On one occasion, defendant initiated anal sex with Randall while using Vaseline as lubricant. Randall testified that about five such sexual acts occurred between him and defendant. Defendant unsuccessfully attempted to have oral sex with Randall on one occasion.

Randall said defendant wore white briefs and was uncircumcised. He said defendant wore a toupee and had a bridge in his mouth. Randall and Rick Sorenson contacted the Lake County State's Attorney's office regarding defendant's actions but were told that no laws had been broken. Randall gave information to a reporter at the Waukegan News-Sun. In 1991, Rick appeared on the television show "Prime Time" which featured the allegations against defendant.

Gerald Adams testified he entered the Navy at Great Lakes in 1989. He was soon approached by a member of the Church. He began attending Church services and often visited the Servicemen's Center across from Great Lakes. Shortly thereafter, Adams entered the O'Plaine Road office and saw defendant and Kevin Sherri, a Church member, lying naked on a big pillow and fondling each other. An-

other Church member named Bob was also present. Defendant told Adams to disrobe and then had Adams and Sherri perform oral sex on one another. Defendant directed Sherri to have anal intercourse with Adams. Defendant placed Adams on a chair and performed anal sex on him. Vaseline Intensive Care Lotion was used as lubricant.

Two weeks later, Adams was summoned to the office and performed sexual acts with defendant and Chuck Thompson. Vaseline and paper towels were produced from defendant's desk drawer. Defendant said these acts were not homosexuality as long as no love or lust was involved. Adams had sex with defendant at least 20 times, often with as many as four people present.

Adams said defendant wore a toupee and had false teeth. Defendant had a purple-colored rash on his groin area and wore white brief-type underwear. Adams admitted he wrote two letters denying that anything irregular had happened in the Church. He later told investigator Mark Pleasant of the Department of Children and Family Services (DCFS) that the letters were false. Adams admitted he had sex with other members of the church, including Thompson, Joe Watson, Dave Armstrong, and the Church trumpeter.

Julius Gruber testified that he was in the Navy stationed in San Diego in 1982 when he became involved with the Church. After he was discharged from the Navy, Gruber became involved with the Church in Waukegan. Gruber performed sexual acts with defendant and Armstrong together on two occasions. Defendant performed anal sex on Gruber on some occasions while Gruber was balanced with his knees on a chair. When defendant wished to have sex, he would tell Gruber "I want to get you" or "I want to stick it to you." Defendant also directed Gruber to have sexual relations with Rich Snow, Richard Brand, Dave Armstrong, Keith Verna, Steve Kirsch, Bill Blackwell, and Mike Carner. Gruber had sex with defendant from 120 to 150 times from 1984 until 1991. Gruber never saw defendant have sex with minors.

Gruber said defendant had grayish-colored pubic hair and wore white briefs. He said defendant wore a toupee and had a purplish rash on his legs and groin area.

Rick Sorenson testified that he was stationed at Great Lakes and first met defendant in 1974. After Rick joined the Church, defendant once kissed him on the lips at the Karcher Hotel and asked "[w]hat would you do if I was to get you in the tail?" In 1978 or 1979, Rick was called to defendant's office and told to rub defendant's back. Defendant then rubbed Vaseline on his penis and performed anal intercourse on Rick. Rick had anal sex with defendant for the next few weeks on a daily basis. Rick described defendant as having gray pubic hair, wearing white briefs, and having brown spots on his legs.

Defendant said Rick would die a violent death if he left the Church. Nonetheless, Rick and Randall Sorenson confronted defendant about the sexual activity and left the Church. Defendant frequently called the Sorensons afterwards to ask whether they had told anyone about the sexual activity.

Howard Ross became involved with the Church in 1979 while stationed at Great Lakes. Defendant had oral and anal sex with Ross at the Karcher Hotel, the Servicemen's Center, and the Church office. Defendant used Vaseline as lubricant and kept hand towels in his desk drawer to clean up. He also testified that defendant was uncircumcised, wore white briefs, and had a toupee. Defendant equated homosexuality with masturbation and often directed Ross to have sex with other male members of the Church. Ross had sex with defendant over 100 times. Defendant would ask Ross "[w]hat if I got you in the butt?" before sexual activity occurred.

Ed O'Claire joined the Navy in 1979 and became involved with the Church in 1980. Defendant once grabbed O'Claire's buttocks and said "[w]hat if I get you right here?" In 1981 at the Karcher Hotel, defendant took Vaseline Intensive Care Lotion from his desk drawer, applied it to O'Claire, and had anal sex with him. O'Claire also had sex with defendant at the Washington Street office, the O'Plaine office, the Belvidere Street Church, and in Virginia. Defendant sometimes placed O'Claire on a chair for anal intercourse. Defendant told O'Claire that such acts were proper so long as no love or lust was involved. O'Claire also had sex with other church members while defendant watched and masturbated.

Bill Decker testified he lived in Pocohontas, Arkansas, in the late 1960's. When he was 14 years old, his family attended a Pentecostal Church where defendant was pastor. Defendant became a friend of the family. On one occasion, Decker stayed at defendant's house overnight. Defendant asked Decker to rub his back. Defendant removed his underwear and then cupped his hand over Decker's genitals. Decker moved away in alarm. Defendant propositioned Decker again soon after. Defendant moved from the town after Decker's mother reported him to the church leaders.

C.L. testified that he was born on January 14, 1972. He met Morehouse and Thompson in Tijuana in 1987 and soon after joined the Church. C.L. lived in a Church-rented apartment in Chula Vista, California, for five months.

C.L. visited Waukegan in January 1988 and worked at the Church for about a year. C.L. said he returned to Tijuana in January 1989 because his father was sick. He then quit the Church. C.L. admitted giving statements to various investigators in August 1989, November

1989, and January 1991 regarding defendant's sexual activity with him. C.L. admitted he told Mark Pleasant from DCFS that defendant kept lotion and paper towels in his desk but C.L. said this statement had been untrue. C.L. denied participating in any sexual activity with defendant in Waukegan, although he had told Chumbley in his statement from January 1991 that this had occurred. C.L. admitted he previously told investigators at San Diego Children's Hospital that he had anal and oral sex with defendant but said his statements there had been untrue.

C.L. denied that he had sex with defendant during a trip to Norfolk. C.L. admitted he told investigators that defendant had gray pubic hair. C.L. also admitted saying that defendant would tell him "I'm going to get you" or "I'm going to put my dick in your butt." C.L. admitted telling investigators that defendant performed sexual acts with the Church trumpeter, Mike Connors. C.L. testified at trial that all these previous statements were lies. C.L. admitted telling investigators that defendant took gray pillows from the closet and used them to have sex on the floor but this had also been untrue.

C.L.'s statements to Chumbley, Art Walker, and Mark Pleasant at the San Diego Children's Hospital were offered into evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.1 (now 725 ILCS 5/115—10.1 (West 1992))). In his statements, C.L. also said that defendant had offered him papers to make him legal in the United States and that defendant said C.L. would go to hell if he left the Church. C.L. had told investigators that defendant was not circumcised. C.L. said defendant also told him that fornication with women was wrong and that sex with men was allowed as long as one controlled one's thoughts. C.L. said all these statements were not true. C.L. also admitted saying that defendant told him that a person who had accused him of being a "faggot" had been run over by a truck. C.L. admitted the videotape was an accurate account of his statement but what he said had been untrue.

C.L. said that Cecelia Fergosa, a former Church member, was the instigator of all the lies about defendant. She told C.L. that he and A.C. could talk about defendant and make some money. Cecelia hated defendant because she owned the Church building in Tijuana and could not get the Church to leave. Cecelia gave C.L. and A.C. a packet of newspaper articles regarding the allegations against defendant.

C.L. said the charges against defendant were motivated by money and he made his statements after reading the articles he received from Cecelia. C.L. said that Cecelia told him to say defendant talked to him about masturbation, that defendant raped him, and that de-

fendant was a homosexual. C.L. testified first that Cecelia did not tell him to describe the Vaseline in defendant's desk, but then later C.L. testified that he said Cecelia did tell him about how he would describe the Vaseline. C.L. said that Cecelia told him to talk about sex in the chair and sex with other members of the Church. C.L. admitted that some of the statements he allegedly got from the newspaper articles are not contained therein. C.L. said he remembered everything Cecelia told him to say and he relayed this to Agent Chumbley. C.L. said he rejoined the Church late in 1991 but he denied receiving financial assistance from the Church.

Arthur Walker testified that he is chief investigator for the Lake County State's Attorney's office. Walker stated that he and Mark Pleasant, another investigator, traveled to San Diego to interview C.L. on January 22, 1991. Agent Wayne Chumbley from the INS and David Rubin from the San Diego district attorney's office were also present. Walker stated that C.L. understood the questions posed to him and was not coerced into cooperating. Walker stated that C.L. signed and attested to the fact that his statements were true and accurate.

Debra Paine and Pamela Thomas testified that they are defendant's daughters. They both stated that Decker did not spend the night at their house on the evening of the alleged abuse.

David Armstrong, Michael Carner, and Vernon Engler are all Church members who have been charged in connection with these accusations against defendant. All three testified at trial and denied having sex with A.C. Armstrong and Carner said they rejected the State's offer of a lesser punishment in exchange for their testimony against defendant.

Jesus Cervantes "Jesse" Escobar testified that he is 23 years old and lives in Tijuana. He joined the Church in 1988 and has known C.L. for six years. In July 1989, Escobar was present during a conversation among A.C., C.L., and Cecelia Fergosa. Cecelia urged them all to accuse defendant of rape, saying if they did so they would receive money. Scott Morehouse, who had left the church, made an appointment for Jesse, A.C., and C.L. to meet agent Chumbley at the border. Before the meeting, Jesse said he, A.C., and C.L. planned to "fuck him (defendant) up." A.C. spoke of making a million dollars.

Jesse admitted giving a tape-recorded statement to Chumbley on August 28, 1989, in which he said defendant had touched his buttocks. Jesse said defendant told him that engaging in masturbation and homosexual activity was not wrong but being with a woman was wrong. Defendant kissed Jesse's penis and then performed anal sex on Jesse. Jesse testified at trial that these statements had been lies.

Charles Thompson testified that he has been a member of the Church since 1982. Thompson never saw defendant grab A.C.'s crotch or touch A.C. in a sexual manner. Thompson said he has never had sex with A.C.

Daniel Lantis testified he is the pastor of the Church in San Diego. He said that neither he nor anyone else told A.C. to write the letter stating there was no homosexuality in the Church. Lantis said A.C. wanted to go to Chicago in 1989. A.C.'s mother expressed concern over the newspaper articles alleging defendant's homosexual activity. Lantis and A.C. explained to A.C.'s mother that the allegations in the articles were lies. Lantis said he has never had sexual relations with A.C. and has never seen defendant have sexual relations with A.C.

The trial court found defendant guilty on all remaining counts. Defendant filed a post-trial motion which was denied. The defendant was sentenced to 31 years of imprisonment. Defendant filed a timely appeal.

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. Defendant notes that the State's case was primarily based on the testimony of A.C. and the section 115—10.1 statements of C.L. Defendant admits that each of the two witnesses established his ability to lie but that A.C.'s testimony is far less credible.

The reviewing court may not substitute its judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of the witnesses. Rather, a criminal conviction is not to be overturned on review unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. (*People v. Draheim* (1993), 242 Ill. App. 3d 80, 88.) The relevant question is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Under this standard, the evidence is clearly sufficient to affirm the trial court's judgment.

▪ The trial court properly concluded that A.C.'s testimony was believable and sufficient to support the verdict. A.C. relayed in detail the series of events which led him to join the Church and develop trust and respect for defendant. A.C. said he respected defendant as the "bishop" of the Church and felt privileged that defendant wanted A.C. to accompany him on out-of-town trips and Church events. A.C. felt grateful that he could do something "good for God."

Defendant subtly initiated his sexual advances by holding A.C.'s leg and asking him if he masturbated. From there, defendant's actions escalated to grabbing A.C.'s crotch and then performing re-

ciprocal acts of oral and anal sex with A.C. A.C. first thought that defendant was testing him. After it became apparent this was not the case, A.C. continued to acquiesce in performing sexual acts because defendant threatened that A.C. would "burn in hell" and "cry forever" if he did not participate. Defendant also told A.C. that the homosexual acts they performed were similar to masturbation and were a good tension release.

Defendant argues that A.C. is discredited by C.L.'s and Jesse Escobar's testimony that they, along with A.C., conjured up the stories of sexual abuse to make money at the urging of Cecelia Fergosa. C.L. said he got information about the allegations from newspaper articles and he lied about the fact that defendant had performed such acts on him. C.L. also testified that A.C. refused to recant his allegations because he wanted to make "a million dollars." We believe that this testimony is simply not credible given the consistency of A.C.'s testimony throughout these proceedings and in light of the fact that C.L.'s previous statements to investigators contained sexual details about defendant that were not included in the newspaper articles. We also believe that the dissimilarities between C.L.'s and Jesse's statements and A.C.'s statements are not significant and only indicate that no conspiracy to destroy defendant ever existed.

Defendant also contends that a thorough cross-examination of A.C. was not permitted since defense counsel was precluded from asking A.C. if he suffered from any physical manifestations of sexual abuse. A.C. stated that he had bleeding from his anal area but could not attribute it to abuse from defendant. The trial court sustained the State's objection to any further questions regarding A.C.'s physical examination in San Diego following the allegations. However, we note that the State never attempted to relate the anal bleeding with A.C.'s sexual activity with defendant; therefore, the trial court did not err in precluding this question. Further, a lack of injury would not disprove sexual abuse. See *People v. Glass* (1992), 239 Ill. App. 3d 916 (testimony of victim of sex offense, as with any crime victim, need not be substantially corroborated by medical evidence in order for defendant to be found guilty beyond a reasonable doubt).

Defendant argues he was also precluded from asking if A.C. ever talked with Chuck Thompson about his involvement with drugs and alcohol. A.C. had previously denied ever talking about his drug and alcohol usage in the Church. We agree with the trial court that defense counsel's attempt to impeach A.C. on that basis was improper since such matters were based on rumor and speculation. (See *People v. DeSavieu* (1983), 120 Ill. App. 3d 420, 430 (impeachment of witness on alleged drug addiction improper where no evidence of addiction

could be shown).) The trial court did not err in sustaining the State's objection to this question.

Defendant also contends that the State asked leading questions of A.C. in order to enhance his testimony. A.C.'s testimony included over 200 pages of direct examination and was of considerable length. Defendant refers to only two leading questions posed by the State, regarding defendant's underwear and defendant's repeated use of the terms "[w]hat if I get ya" or similar expressions to convey his desire for sex. However, defendant's objections to these questions were sustained, and we do not conclude that posing either of these questions changed the outcome of the case. We hold that A.C.'s testimony was credible and that the evidence is sufficient to affirm defendant's conviction.

Defendant next contends he was unfairly prejudiced and denied the right to a fair trial where the trial court allowed "other acts" testimony regarding sexual conduct with several adult males. Defendant argues that the prejudicial impact of the testimony of these men outweighed any probative value and amounted to prosecutorial overkill. Defendant concludes that such testimony made it impossible for him to receive a fair trial.

As a general rule, evidence indicating that a defendant committed prior bad acts is improper where its purpose is to demonstrate the defendant's propensity to commit crime. (*People v. Davis* (1993), 248 Ill. App. 3d 886, 891.) Such evidence, often referred to as "other offenses" evidence or "extrinsic acts" evidence, is admissible if it is relevant to establish any material question other than to show the propensity to commit crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62; *Davis*, 248 Ill. App. 3d at 891.) The erroneous admission of other offenses evidence carries a high risk of prejudice and generally calls for a reversal. (*People v. Mason* (1991), 219 Ill. App. 3d 76, 80.) Therefore, the trial court must balance the probative effect of such evidence against any prejudicial effect. (*Davis*, 248 Ill. App. 3d at 891.) A reviewing court will not disturb the trial court's decision concerning the admission of other offenses evidence absent an abuse of discretion. *People v. Vazquez* (1989), 180 Ill. App. 3d 270, 277.

We note that defendant's activity with the adult male witnesses at trial was that of consenting adults and thus was not a crime. However, other crimes evidence may include acts which may not be a criminal offense. (See *People v. Smith* (1990), 141 Ill. 2d 40 (evidence of gang membership is admissible to show motive, but only where there is sufficient proof that such membership is related to the crime charged).) Defense counsel made numerous objections during trial in an attempt to preclude the admission of other acts evidence. The

trial court's comments indicate it allowed such testimony to show the common plan, scheme, and design of the defendant, to confirm defendant's identification, and to demonstrate the lack of a conspiracy by the victims as alleged by the defense. While other acts evidence is admissible for these purposes (see *Mason*, 219 Ill. App. 3d at 80), the trial court must take care to consider the proper limited purpose for such evidence. We note here that the trial judge repeatedly stated during trial that he would only consider those aspects of the witnesses' testimony that were appropriate.

■ We conclude the evidence of sexual relations with other men was relevant and admissible as part of a common plan, scheme, or design. All of the witnesses testified that defendant initially approached them with questions about masturbation and whether they had ever participated in homosexual acts. The witnesses were told that homosexual acts were similar to masturbation and were not wrong as long as no love or lust for the man was involved. Defendant's questions would typically become more frequent and defendant would say things in the context of these conversations such as "I'm going to get ya" or "[w]hat if I were to get ya?" Many of the witnesses concurred with A.C.'s testimony that defendant would use Vaseline Intensive Care Lotion or Vaseline petroleum jelly as a lubricant. The testimony indicates these items were kept in defendant's desk drawer along with paper towels for cleaning up afterwards.

A.C.'s description of how defendant would position him to have sex in a chair was also similar to accounts given by several of the witnesses. Some of the witnesses' testimony mirrored A.C.'s description of sexual acts performed on the floor with a large pillow which defendant kept in his office. These accounts were similar enough to inform the court of defendant's common plan, scheme, or design, but were varied enough to be credible and to confirm that the testimonies were not part of a rehearsed conspiracy against defendant. Defendant correctly notes that none of the witnesses testified that they observed defendant exhibiting inappropriate behavior or sexual activity with minors. However, we believe it would only be logical that defendant would chose to reveal his sexual activity with a minor to a select cadre of Church members, some of whom have also been charged in connection with these offenses.

In addition, these witnesses gave detailed accounts of defendant's intimate physical makeup which were similar to those contained in A.C.'s testimony. Specifically, several witnesses testified that defendant wore a toupee or hairpiece, had false teeth or a bridge, was uncircumcised, had grayish pubic hair, never wore a condom, had a rash on his groin, had spots on his legs, and wore white brief

underwear. Five of the witnesses testified, as did A.C., that defendant told them they would go to hell if they left the Church. The fact that the testimonies varied slightly indicates the victims and witnesses did not rehearse their statements as part of a conspiracy. We believe the probative value of these statements outweighed any prejudicial effect and that such testimony was relevant and admissible. In addition, this case does not present the same possibility of prejudice inherent in a jury trial since it is presumed that the court considers only admissible evidence in a bench trial. (See *People v. Dugan* (1992), 237 Ill. App. 3d 688, 698.) The trial court did not abuse its discretion in allowing such testimony.

■ Defendant also argues that Decker's testimony should be regarded with grave scrutiny since the alleged act occurred over 20 years ago. However, our supreme court has noted that "the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." (*People v. Illgen* (1991), 145 Ill. 2d 353, 370.) The decision whether to admit such evidence must be made on a case-by-case basis by the trial judge. (*Illgen*, 145 Ill. 2d at 370.) We conclude Decker's testimony was sufficiently credible and probative to be admissible and was not an abuse of discretion.

Defendant next contends that his convictions of child pornography must be reversed since the record is devoid of any evidence that defendant produced a live performance or solicited A.C. to appear in a live performance where the minor was sexually exploited. Defendant was convicted of nine counts of child pornography which alleged he solicited A.C., a minor, and produced live performances where A.C. was directed to engage in various lewd acts, including oral and anal sex with David Armstrong and Michael Carner. Defendant contends that a live performance or presentation contemplates activity which is produced for the benefit of an audience; therefore, because the activity here was not produced for the benefit of an audience, an essential element of the offense was not present.

Defendant's child pornography convictions were based on section 11—20.1(a), which reads in pertinent part as follows:

"(a) A person commits the offense of child pornography who:

* * *

(3) with knowledge of the subject matter or theme thereof, produces any stage play, live performance, film, videotape or other similar visual portrayal which includes a child whom the person knows or reasonably should know to be under the age of 18 *** engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection; or

(4) solicits any child whom he knows or reasonably should know to be under the age of 18 *** to appear in any stage play, live presentation, film, videotape, photograph or other similar visual reproduction in which the child *** is or will be depicted, actually or by simulation, in any act, pose or setting described in subparagraphs (i) through (vii) of paragraph (1) of this subsection; or

(5) is a parent, legal guardian or other person having care or custody of a child whom the person knows or reasonably should know to be under the age of 18 *** and who knowingly permits or arranges for such child *** to appear in any stage play, live performance, film, videotape, photograph or other similar visual presentation, portrayal or simulation of any act or activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection ***." (Ill. Rev. Stat. 1991, ch. 38, pars. 11—20.1(a)(3), (a)(4), (a)(5) (now 720 ILCS 5/11—20.1(a)(3), (a)(4), (a)(5) (West 1992)).)

The acts described in subparagraphs (i) through (vii) of paragraph 1 include oral and anal intercourse, masturbation, and lewd fondling. (Ill. Rev. Stat. 1991, ch. 38, pars. 11—20.1(a)(1)(i) through (vii) (now 720 ILCS 5/11—20.1(a)(1)(i) through (vii) (West 1992)).) A.C. testified that on several occasions he engaged in sexual activity with defendant together with other Church members; one such gathering including as many as seven or eight other men. Defendant would always direct the sexual acts that the men were to perform on one another and then defendant himself would join in the activity. A.C. testified that defendant would typically direct one person to perform oral or anal sex with A.C. while defendant watched and masturbated.

Defendant cites *New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348, in support of his contention that an audience is necessary for defendant's acts to constitute child pornography. In *Ferber*, the Supreme Court upheld as constitutional a child pornography statute that described a performance as "any play, motion picture, photograph or dance" or "any other visual representation exhibited before an audience." (*Ferber*, 458 U.S. at 751, 73 L. Ed. 2d at 1119, 102 S. Ct. at 3351.) Defendant contends the element of "production" is not satisfied here since the directions which defendant reportedly gave during sexual activity with A.C. were part of defendant's own participation and did not contemplate the amusement of an audience. The State counters that no case law supports the argument that our statute is limited to require such acts in front of an audience.

We agree with the State that the legislative debates which defendant appended to his brief do not add anything that would support his contention. In addition, the State correctly notes that section

11—20.1(f)(2) of the Criminal Code of 1961, which defines "[p]roduce" as "to direct, promote, advertise, publish, manufacture, issue, present or show," does not specifically refer to an audience. Ill. Rev. Stat. 1991, ch. 38, par. 11—20.1(f)(2) (now 720 ILCS 5/11—20.1(f)(2) (West 1992)).

■ However, we do not believe that our child pornography statute was intended to apply to acts such as those alleged in A.C.'s testimony. The sexual acts which defendant orchestrated were clearly executed for defendant's own pleasure and most likely the pleasure of the other adults present; however, we do not conclude that such acts constituted a live presentation or performance as contemplated in the statute. The acts here occurred in the privacy of defendant's office and all those present were participants to some extent. This setting renders the actions less akin to child pornography. Rather, the adults committing sexual acts with A.C. would be guilty of aggravated criminal sexual assault. (See Ill. Rev. Stat. 1991, ch. 38, par. 12—13 (now 720 ILCS 5/12—13 (West 1992)).) Accordingly, we reverse defendant's convictions on the child pornography counts outright. All remaining convictions stand.

Defendant next contends that the trial court abused its discretion in sentencing defendant when it considered as aggravation a factor inherent in the charged offense. Defendant contends that the trial court applied in aggravation the factor that "defendant held a position of trust or supervision" with regard to A.C. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(14) (now 730 ILCS 5/5—5—3.2(a)(14) (West 1992)).) Defendant argues that this factor was inherent in several counts of the indictment. See Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(4) (now 720 ILCS 5/12—13(a)(4) (West 1992)); Ill. Rev. Stat. 1991, ch. 38, par. 12—16(f) (now 720 ILCS 5/12—16(f) (West 1992)).

■ This court has previously held that the aggravating factor relating to a defendant who holds a "position of trust or supervision" could be applied to a convicted sex offender who was the minister of a church. (See *People v. Bosley* (1990), 197 Ill. App. 3d 215, 222.) Defendant notes that, in *Bosley*, the defendant's status of trust was not an element of the charged offense. However, we do not conclude that the trial court's comments on this issue warrant a reversal. The record indicates that the trial court included the issue of defendant's position of trust generally during its comments prior to sentencing. The trial judge's comment in the context of the entire sentencing hearing does not indicate that this issue led to a longer sentence which would in turn necessitate a remand for resentencing. See *People v. Bourke* (1983), 96 Ill. 2d 327, 332.

Defendant also contends the trial court erroneously considered as

an aggravating factor that defendant was obliged to prevent the offense committed because of his position as pastor. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(4) (now 730 ILCS 5/5—5—3.2(a)(4) (West 1992)).) Here, the trial court made the following comments:

> "I agree with factor number four that the defendant was obliged to prevent this type of situation. In fact ministers I believe are mandatory reporting people ***. If ministers aren't, they should be. A minister should be the last person to abuse a child, and if he finds out about it, he's supposed to call DCFS or call the police and report it and stop it right now this minute."

■ Defendant correctly points out that this factor does not apply to clergymen and that the trial court erred in considering it as an aggravating factor. (*Bosley*, 197 Ill. App. 3d at 222.) However, given the overwhelming evidence in this case and the trial court's thorough discussion of all the factors in aggravation and mitigation, we believe the trial court's consideration of this factor was not significant enough to result in a greater sentence. *Bourke*, 96 Ill. 2d at 332.

■ Defendant also contends that the trial court failed to consider the mitigating testimony of defendant's witnesses and the large volume of supportive letters as mitigating factors. We note that the trial court specifically stated that defendant was eligible for an extended-term sentence. However, the trial court considered "the good things defendant has done, the good things he's done for the community, his lack of prior criminal record, his age, his health problems," in addition to the letters of support, in determining that an extended sentence was not appropriate. We conclude the trial court properly considered the factors offered in mitigation.

Defendant last contends his sentence was excessive, cruel, and unusual. Defendant notes he is 57 years old, has no criminal record previous to these proceedings, and has received only three minor traffic violations. Defendant also suffers from diabetes, high blood pressure, and pain in his joints. The trial court sentenced defendant as follows: count I, 12 years; count II, 12 years consecutive to count I; count XXI, 7 years consecutive to counts I and II; counts XIII, XV, XVI, XVII, IXX, XX, XXII, XXIII, 7 years concurrent with the third consecutive sentence and consecutive to the first two sentences; and counts III, IV, V, VI, VII, VIII, IX, XI, XII, XXIV, XXV, XXVI, XXVII, 5 years concurrent with the third consecutive sentence and consecutive to the first two sentences, for a total of 31 years of imprisonment. The trial court ordered defendant's sentences on the child pornography convictions to be concurrent to sentences on his other convictions; thus, our reversal of the pornography counts does not lessen defendant's total years of imprisonment.

A trial judge's sentencing decision is entitled to great deference and weight. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) A reviewing court's power to alter or reduce a sentence pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) is limited to those cases in which a trial court has abused its discretion. (*People v. Keating* (1993), 252 Ill. App. 3d 801, 803.) Defendant contends that the trial court neglected to consider the objective of restoring defendant to useful citizenship and failed to impose a sentence which balances the rehabilitation potential of the offender with the need to protect society. However, the trial court must consider not only defendant's history and his rehabilitative potential, but also the seriousness of the offense, the need to protect society, and the need for deterrence. *People v. Goodwin* (1991), 208 Ill. App. 3d 829, 831.

■ The trial court is in a better position than this court to fashion an appropriate penalty after observation of defendant and consideration of such factors as defendant's demeanor, general moral character, mentality, social environment, habits, and age. (*Keating*, 252 Ill. App. 3d at 803.) We believe the trial court properly considered the seriousness of the offenses and defendant's repetition of such acts in sentencing defendant to 31 years of imprisonment. The trial court acknowledged defendant's lack of criminal record and possible health risks and clearly lessened the sentence in consideration of defendant's good acts in the community. We hold the trial court did not abuse its discretion, and we affirm defendant's sentence.

For the foregoing reasons, we reverse defendant's convictions on all child pornography counts and affirm all remaining convictions and sentences.

Affirmed in part; reversed in part.

DOYLE and PECCARELLI, JJ., concur.