2019 IL App (1st) 180017-U

No. 1-18-0017

Order filed November 8, 2019

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 18015 |
| | ) | |
| LUIS VELEZ DELGADO, | ) | Honorable |
| | ) | Gregory R. Ginex, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's convictions for aggravated criminal sexual assault and aggravated domestic battery are affirmed over his contentions that the State's witnesses were unworthy of belief and that their testimony was not corroborated by photographs, medical records, or evidence of physical trauma to the victim.

¶ 2    Following a bench trial, defendant Luis Velez Delgado was found guilty of three counts of aggravated criminal sexual assault and two counts of aggravated domestic battery. He was sentenced to three six-year prison terms for aggravated criminal sexual assault and one four-year

term for aggravated domestic battery. All sentences were to be served consecutively. On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt when the State's witnesses were not worthy of belief and there "existed no other evidence" to hold him "accountable" for the offenses. We affirm.

¶ 3    Defendant was charged in an 18-count indictment with multiple offenses arising out of his dating relationship with F.O. The State nol-prossed several counts before trial, and proceeded on nine counts of aggravated criminal sexual assault and three counts of aggravated domestic battery. Relevant here, the State alleged that between October 2 and 4, 2015, defendant committed aggravated criminal sexual assault in that he inserted his penis into the anus of F.O. by use of force or threat of force and caused bodily harm to F.O. (count V), and in that he inserted his penis into a sex organ of F.O. and the criminal sexual assault was perpetrated during the course of aggravated battery by strangulation (count X), and on October 5, 2015, defendant inserted his penis into the sex organ of F.O. by use of force or threat of force during the commission of aggravated battery by strangulation (count XIV) (720 ILCS 5/11-1.30(a)(2), (4) (West 2014)). The State also alleged, in pertinent part, that defendant committed aggravated domestic battery by strangling F.O., with whom he had a dating relationship, on October 2, 2015 (count XI), and October 5, 2015 (count XV) (720 ILCS 5/12-3.3(a-5) (West 2014)).[1]

¶ 4    At trial, F.O. testified that she immigrated to the United States from Mexico in 2014 and had two young daughters. In August 2015, she met defendant through an internet dating application. Defendant was loving and respectful, and after three days "proposed" that they live together. F.O. thought about it, and "four [or] five days later," began to look at apartments.

---

[1] An interpreter translated the proceedings into Spanish for defendant, and also translated the testimony of two witnesses, F.O. and A.O., into English.

Defendant "told" her to lend him money for the security deposit, so F.O. paid the deposit. F.O., her two children, and defendant then moved in together. At this point, F.O. stopped working because defendant did not want her to work. Defendant also began to act jealous and possessive.

¶ 5    On September 30, 2015, four days after they moved in together, defendant was "somewhat aggressive" verbally. When defendant came home, he told F.O. he was hungry so she made him dinner. She then went to bed and pretended to be asleep because defendant was saying things she did not like. Specifically, defendant stated that he had other women who "would make him feel more of a man" and that he could have any woman he wanted. In the bedroom, the bed was against the wall and F.O. lay facing the wall. Defendant entered the room, put his arm over her neck, and put her against the wall. She felt like she was suffocating and told defendant that he was hurting her. Defendant removed F.O.'s shorts, stated that he wanted to get her pregnant, and penetrated her vagina with his penis. Once defendant ejaculated, F.O. was able to push him away, redress, and leave the room. She went to the living room where she sat on the floor and cried. Defendant came into the room, grabbed her hair, and took her back to bed. There, defendant moved her arms so that she was hugging him, "like nothing had happened."

¶ 6    On October 2, 2015, F.O. was watching television with her daughters when defendant entered the room, said it was late for the girls to be watching television, and that if they did not go to sleep, he was going to punish them. The girls, who were seven and four years old, became afraid and moved closer to F.O. Defendant grabbed the four-year-old by the arm, shook her, and put her in a bedroom. Once both girls were in the bedroom, defendant closed the door and said he was in the "mood." F.O. did not want to have sex. However, defendant pushed her face down onto the bed such that she could not breathe, held her hands above her head, removed her

clothes, and penetrated her anus with his penis. F.O. asked defendant to stop because he was hurting her. Once defendant ejaculated, he used his hand to insert his penis into F.O.'s vagina and stated that F.O. belonged to him as long as he wanted.

¶ 7     On October 5, 2015, defendant entered the bedroom where F.O. was sleeping, turned her onto her back, put his hands on her throat, separated her legs, and placed all of his weight on her. F.O. asked him to let her go. However, defendant lowered her underwear and penetrated her vagina with his penis. F.O. did not want to have sex with defendant and felt like she was asphyxiating. She told defendant that he was hurting her and that "it would be better if it was over between us." Defendant responded that F.O. "was going to be his until he wanted" it to "be over." The following day, F.O. was in the shower and unlocked the door so that defendant could use the bathroom. Defendant then got into the shower with F.O. She asked him to leave and he responded that "it will be over when he decides so." When defendant tried to hug her, F.O. pushed him. Defendant then put his hand on F.O.'s throat and pushed her into the corner. F.O. could not breathe. Although she was able to move away, defendant then pulled her back and she fell forward with her hands on the toilet. Defendant then penetrated her with his penis. F.O. told defendant she was tired of him and he replied that he would stop when he decided to stop.

¶ 8     F.O. did not call the police or tell anyone what defendant was doing because she was afraid. Defendant told her that he would kill her if she ever left him, and that he would take her younger daughter and she would never see the girl again. However, on October 9, 2015, F.O. left after defendant tried to push her down a stairwell while she was holding her daughter. At this point, F.O. and defendant began to argue, and she asked him to get out of her apartment. Defendant was not willing to leave and became "kind of crazy," so F.O. left with her daughters.

She went to the parking lot in front of her aunt's house, spoke to her aunt, and made arrangements for her daughters to stay with her aunt. F.O. stayed in her truck. Defendant began to call and text, but F.O. turned off her phone. She later returned to the apartment to get her things.

¶ 9     Once inside, defendant told her to take her things and leave. F.O. became upset and told defendant that he was the one who was supposed to leave. They began to struggle. Defendant stated that it was his apartment and she should leave. F.O. left, parked in the lot of her aunt's building, and again received threatening text messages and voicemails from defendant. Defendant then arrived and parked behind her. He walked to her vehicle, hit the window, and said that if she did not open the door and give him the apartment keys, he would kill her. F.O. was scared and dialed 911. Although F.O. told the responding officers that defendant was putting herself and her daughters on the street, an officer took her apartment keys and gave them to defendant.

¶ 10    The next day, F.O. returned to the apartment and spoke to the landlord. Police then arrived, and F.O. went to the door with the police and the landlord. Defendant refused to open the door, so the landlord opened it. Defendant was in bed, and a police officer told him to get up and get dressed. When an officer asked F.O. what was going on, she answered that she was "suffering violence" with defendant. Defendant screamed "f*** b***, what are you doing? This is my apartment." The officers told defendant to leave. Later, F.O. went to a police station to make a statement because defendant had complained about how the officers removed him from the apartment. It was at this point that F.O. told someone about what had happened between her and defendant.

¶ 11 During cross-examination, F.O. testified that she met defendant in person in August, and that after their first meeting, defendant "insisted" they meet every day. From September 30 until October 4, 2015, she did not call the police or tell her aunt what was happening. During redirect, F.O. testified that she told defendant's mother what was happening, and argued with defendant because he broke his promise to stop using drugs. During recross, F.O. testified that defendant's mother asked her to be patient because defendant was going to change.

¶ 12 A.O., F.O.'s nine-year-old daughter, testified that she was sitting on the couch when defendant pushed her into a bedroom and hit F.O. A.O. heard her mom scream for help. Another time, she was watching television when she saw defendant enter the bedroom where her mother was lying down. She looked through a door's keyhole and saw defendant "raping" her mother. The defense objected as to the conclusion and the trial court sustained the objection. A.O. then testified that she saw defendant moving on top of F.O., and F.O. pushing him away. She also heard F.O. say stop and to "let her go." While living with defendant, A.O. heard him say he was going to kill F.O. After they left the apartment, A.O. spent the night at her aunt's house and her mother stayed in the truck. A.O. saw defendant hitting the truck while holding a knife in his hand. She heard him tell F.O. to leave the truck because he was going to kill her. Later, the police came and defendant told them that F.O. was crazy. The next day, A.O. and her mother returned to the apartment. Defendant was very upset, threw things, and said that he was going to the police to take revenge.

¶ 13 During cross-examination, A.O. acknowledged that she spoke with F.O. about the fact that she had to testify, but denied discussing "what had happened" between F.O. and defendant. A.O. also testified that after she saw defendant on top of her mother, she left the apartment and

went downstairs to ask neighbors for help. The neighbors called the police. When the police arrived, the officers talked to F.O. and tried to arrest defendant. She further testified that this encounter was when defendant threatened to take revenge.

¶ 14    Cicero police officer Nestor Vela testified that on October 11, 2015, he was dispatched to a residence on a "clothing removal" call. Once there, he spoke to the landlord and F.O., and then went upstairs where the landlord opened the apartment door. When F.O. opened a bedroom door, she "instantly" stepped back "very frightened" and said that "he" was on the bed. Vera and his partner woke defendant and suggested that defendant leave so that F.O. could get her items. The officers went outside and when F.O. came out, they asked if she was okay. After speaking to F.O., Vera and his partner decided to place defendant in custody for a domestic battery investigation. F.O. later went with Vera to the police station to make a statement and sign a complaint against defendant.

¶ 15    The defense presented Sonia Delgado Coto, defendant's mother, who testified that she had only ever spoken to F.O. on the phone. F.O. never said that she had problems with defendant or that defendant hit or sexually assaulted her. During their final phone call, F.O. told Coto that defendant had been taken to jail over a "problem with a woman," and asked for $1000 for bond.

¶ 16    In finding defendant guilty of three counts of aggravated criminal sexual assault (counts V, X, and XIV), and two counts of aggravated domestic battery (counts XI and XV), the trial court noted the defense's argument that F.O. had several opportunities to tell the police what was happening and that F.O. could have left and gone to her aunt's home but did not, as well as Coto's testimony that F.O. did not reveal the abuse. However, the court stated that it viewed Coto's testimony in light of all the evidence and the fact that she was defendant's mother. The

court also noted the "cycle of abuse that possibly had occurred here," as well as F.O.'s "status" and how that might affect her making a complaint to the police. The trial court found defendant not guilty of six counts of aggravated criminal sexual assault and one count of aggravated domestic battery, finding either that F.O.'s testimony did not establish all the elements of those offenses as charged or that her testimony was "somewhat confusing." Defendant filed a motion for a new trial, which the court denied. Defendant was sentenced to three six-year prison terms for aggravated criminal sexual assault, and to one four-year prison term for aggravated domestic battery.[2] All sentences were to run consecutively.

¶ 17    On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt because the testimony of the State's witnesses was inconsistent, impeached, and unpersuasive, and there was "no other evidence" which would hold him "accountable" for the offenses.

¶ 18    When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. All reasonable inferences from the record must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. A defendant's conviction will

---

[2] Count XV (aggravated domestic battery) was merged into count XIV (aggravated criminal sexual assault) for sentencing purposes.

not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt. *Id.*

¶ 19    To prove defendant guilty of aggravated criminal sexual assault as charged in the case at bar, the State had to prove beyond a reasonable doubt that (1) between October 2 and October 4, 2015, defendant committed an act of sexual penetration of F.O. in that he inserted his penis into her anus by force or threat of force and caused bodily harm to F.O. (count V); (2) between October 2 and October 4, 2015, defendant committed an act of sexual penetration of F.O. in that he inserted his penis into her sex organ by force or threat of force during the commission of the felony offense of aggravated battery by strangulation (count X); and (3) on October 5, 2015, defendant committed an act of sexual penetration of F.O. in that he inserted his penis into her sex organ by force or threat of force during the commission of the felony offense of aggravated battery by strangulation (court XIV). 720 ILCS 5/11-1.30(a)(2), (4) (West 2014). To prove defendant guilty of aggravated domestic battery, as charged in this case, the State had to establish beyond a reasonable doubt that defendant, in committing a domestic battery, strangled F.O., with whom he was in a dating relationship (counts XI and XV). 720 ILCS 5/12-3.3(a-5) (West 2014).

¶ 20    Here, taking the evidence in the light most favorable to the State, there was sufficient evidence from which a rational trier of fact could find the elements of the offenses. F.O. testified that on October 2, 2015, defendant entered the bedroom, pushed her face down into the bed in such a way that she was unable to breathe, removed her clothing, and penetrated her anally and vaginally. F.O. further testified that on October 5, 2015, defendant put his hands around her throat, pinned her to the bed, and penetrated her vagina with his penis. Although F.O., who felt

like she was asphyxiating, told defendant that it would be better it they broke up, defendant replied that their relationship would be over when he decided it was over. F.O. explained that she did not tell anyone except defendant's mother what was happening because defendant threatened to kill her and take her daughter. However, F.O. left after defendant tried to push her down the stairs while she was holding one of her daughters. After defendant was removed from the apartment by the police, she revealed to officers what had been happening in her relationship with defendant. A.O. also testified that she saw defendant on top of F.O. and F.O. push defendant away while saying stop. A.O. also heard defendant threaten to kill F.O. Although defendant's mother denied that F.O. revealed any problems in F.O. and defendant's relationship, the trial court found F.O. and A.O. to be credible and defendant's mother to be incredible, as evidenced by its guilty findings. We therefore cannot say that no reasonable trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. *Brown*, 2013 IL 114196, ¶ 48.

¶ 21 Defendant, however, argues F.O. was not credible because she did not tell anyone about the assaults "despite multiple opportunities to do so," and concludes that the trial court agreed because the court did not enter a guilty finding "on any count where she was the only witness." Defendant further argues that A.O.'s testimony was incredible because she was a child and that the court failed to give the "proper weight" to his mother's testimony.

¶ 22 Witness credibility is a question for the trier of fact, and to win an outright reversal of his conviction, defendant must show that F.O.'s and A.O.'s testimony was so incredible that "no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Defendant's arguments do not carry this heavy burden.

¶ 23    Defendant is correct that F.O. had opportunities to both leave the apartment and tell other people about defendant's actions before she actually did. F.O. testified, however, that she was afraid of defendant because he threatened to kill her and take her daughter, and the trial court noted her delay in telling anyone when announcing its guilty findings. The court found that there was a "cycle of abuse" in the relationship and that F.O. may have been afraid to go to the police because of her "status," that is, she may have been undocumented and worried about immigration consequences. To the extent that defendant contends A.O. was unbelievable because she was a child, we disagree. A.O. was nine years old at the time of trial and was able to testify and be cross-examined. Her youth and what effect, if any, it had upon her recollection and the weight to be given to her testimony was for the trier of fact to consider. To the extent that defendant challenges A.O.'s testimony that defendant was "raping" F.O., the record reveals that the defense objected to this testimony and the trial court sustained the objection. Moreover, although defendant contends that A.O. contradicted F.O. about whether neighbors were involved when the police came to the apartment, F.O. testified that the landlord opened the door to let her inside without identifying the landlord by name or whether the landlord was also a neighbor. Their testimony that someone other than F.O, A.O. and the police were in the apartment was consistent, and any discrepancies about the identity of the other person was an issue for the trier of fact. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 24    The trial court also specifically mentioned that it had considered defendant's mother's testimony in light of all the evidence and the fact that she was defendant's mother. See *People v. Gabriel*, 398 Ill. App. 3d 332, 342 (2010) (a "trial court is not obligated to believe a defendant's alibi witnesses over the State's witness, especially where the defendant's witnesses are related to

the defendant"); *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) ("the alibi witnesses were defendant's cousins and, as such, their credibility may have carried little weight).

¶ 25    We are unpersuaded by defendant's conclusion that the trial court found F.O. to be an incredible witness because it only found defendant guilty of the aggravated criminal sexual assault and aggravated domestic battery counts that were "corroborated" by the testimony of additional witnesses. In finding defendant not guilty of certain counts of aggravated criminal sexual assault and aggravated domestic battery, the court noted either that F.O.'s testimony did not establish all the elements of those offenses, or that the testimony related to a particular offense was confusing and left reasonable doubt as to defendant's guilt. At no point did the court find F.O. incredible.

¶ 26    Defendant finally notes that no photographs, medical records, or evidence of trauma to F.O.'s body were presented at trial. However, it is well established that the lack of an injury does not disprove sexual assault. See, *e.g.*, *People v. Davis*, 260 Ill. App. 3d 176, 189 (1994). Although defendant is correct that no photographs or medical evidence were presented at trial, physical evidence is not required. See *People v. Willer*, 281 Ill. App. 3d 939, 948-49 (1996) ("there is no requirement that a victim's testimony be corroborated by medical evidence to sustain a conviction for criminal sexual assault"). F.O.'s testimony clearly described how defendant vaginally and anally penetrated her with his penis and how he strangled her, and thus the State's evidence was sufficient to establish defendant's guilt beyond a reasonable doubt. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("the testimony of a single witness, if positive and credible, is sufficient to convict").

¶ 27 Defendant's arguments on appeal are, essentially, a request to reweigh the evidence presented at trial in his favor and substitute our judgment for that of the trier of fact. This we cannot do. See *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) ("A reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact."). It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences therefrom. *Brown*, 2013 IL 114196, ¶ 48. In doing so, the trier of fact is not required to disregard the inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. In the case at bar, the trial court found F.O. and A.O. to be credible; we will not reverse a conviction simply because a defendant argues that witnesses were not credible. *People v. Evans*, 209 Ill. 2d 194, 211-12 (2004). A defendant's conviction will be overturned only if the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt (*Brown*, 2013 IL 114196, ¶ 48); this is not one of those cases. We therefore affirm defendant's convictions.

¶ 28 For the forgoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 29 Affirmed.