NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 241050-U

NO. 4-24-1050

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Stephenson County |
| DREW A. CHELBERG, | ) | No. 22CF347 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Glenn R. Schorsch, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, finding (1) defendant was not denied the effective assistance of counsel when trial counsel failed to request a limiting instruction for other-acts evidence introduced at trial and (2) clear or obvious error did not occur at sentencing where the trial court did not assign significant weight to improper factors in aggravation.

¶ 2   In December 2023, a jury convicted defendant, Drew A. Chelberg, of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)) and criminal sexual assault (*id.* § 11-1.20(a)(3)). In July 2024, the trial court sentenced defendant to 18 years' imprisonment. On appeal, defendant argues (1) his trial counsel was ineffective for failing to request a limiting instruction for other-acts evidence introduced at trial and (2) the court erred when it relied on improper aggravating factors when sentencing defendant. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On December 15, 2022, defendant was charged by information with predatory criminal sexual assault of a child (count I) (*id.* § 11-1.40(a)(1)) and criminal sexual assault (count II) (*id.* § 11-1.20(a)(3)). In count I, the State alleged defendant, who was over 17 years of age, committed an act of sexual penetration with A.C., who was under 13 years of age, in that he placed his penis inside the mouth of A.C. In count II, the State alleged defendant committed an act of sexual penetration with A.C., who was under 18 years of age and a family member of defendant, in that he placed his penis inside the mouth of A.C.

¶ 5                                A. Pretrial Proceedings

¶ 6        In February 2023, the State filed a motion *in limine* to admit other-acts evidence from defendant's Google account consisting of internet searches for "sex dolls," "mini sex dolls," and webpages containing images of sex dolls that resembled female children.

¶ 7        The trial court held a hearing on the State's motion on May 31, 2023. The State argued the other-acts evidence was admissible to show intent because the evidence suggested defendant's "sexual interest in minor children." The State noted it would not object to a limiting instruction that the jury could only consider the evidence for the purpose of intent. The court took the matter under advisement.

¶ 8        In September 2023, the trial court granted the State's motion *in limine* but limited the other-acts evidence to three searches and one picture of a sex doll.

¶ 9                                    B. Jury Trial

¶ 10       The trial court conducted a jury trial in December 2023. The parties stipulated A.C. was born in June 2014 and defendant was born in May 1993.

¶ 11                              1. *Saige F.'s Testimony*

¶ 12       Saige F. testified she and defendant were married for 10 years but divorced after

the incident. They lived in Freeport, Illinois, and had three children together: A.C., R.C., and J.C. In May 2022, A.C. was seven years old.

¶ 13    On May 14, 2022, the family was planning on going out for breakfast. Saige woke up around 7:30 a.m. and told defendant she was going to get the kids ready. Defendant asked Saige to have sex with him before leaving. She told him no, as she and the kids were hungry and "that we could just do it later." Saige then took J.C. upstairs and told A.C. to look for her hairbrush. After two to three minutes, she went down a couple steps on the stairs to check on A.C. She saw A.C. come out of the kitchen and stumble. Saige noticed A.C. "looked kind of shaken up or nervous." Defendant came out of the kitchen about 20 seconds later. Saige asked what was going on, and defendant said he was helping look for the hairbrush.

¶ 14    Saige told A.C. to come upstairs. When Saige was brushing her hair, A.C. began acting "[a] little strange." A.C. was opening and closing her mouth and moving her tongue around as if "she had a bad taste in her mouth." Saige had never seen A.C. do this before. When Saige asked if she was okay, A.C. became very defensive and "seemed visibly upset." Saige took A.C. into the bedroom and told her she was not in trouble. A.C. started to cry and said she did not want to talk about it. Saige went back into the hallway to ask defendant if he knew why A.C. was upset. He did not know and asked if he could talk to A.C., but Saige told him no.

¶ 15    Saige went back into the bedroom and again asked A.C. what was wrong. A.C. started to cry harder and told Saige "she didn't think this could be fixed." After some time, A.C. told Saige defendant had covered her eyes and put something warm in her mouth. Saige left A.C. in the bedroom and went downstairs to confront defendant. Defendant told Saige "that maybe he had smacked her butt" as A.C. was looking for her hairbrush. When Saige told him A.C. had said he put something in her mouth, defendant replied "he might have tried to poke [A.C.]'s face on

the way by in the kitchen and maybe his finger slipped in her mouth."

¶ 16    When Saige told defendant she was going to take A.C. to get a DNA test, defendant insisted Saige "would be ruining our lives." Defendant promised "he wouldn't go near [A.C.], he wouldn't look at her, he wouldn't touch her" if Saige did not tell anyone about what happened. Saige refused and told defendant to leave the house. He left the house around 9 a.m. with his cell phone.

¶ 17    Six days after the incident, Saige recovered defendant's cell phone from the police. While going through the downloads folder on the phone, she found a couple articles which had been downloaded right after she had asked defendant to leave the house. The articles "were about how long the police would be able to find semen in cases of oral sex." At that point, Saige "didn't have any doubts that he had done it."

¶ 18                                   2. *A.C.'s Testimony*

¶ 19    A.C. testified she was nine years old at the time of trial. The last time she saw defendant was when they were getting ready to go to a restaurant. That morning, she woke up on the couch in the living room, and her mother told her to find a hairbrush. A.C. looked for the hairbrush in the kitchen. As she was looking, defendant entered the kitchen and covered her eyes with his hand. Defendant opened A.C.'s mouth with his pointer finger and thumb and put something in her mouth. She could not see what was put in her mouth, but she recalled the object was "warm," a "cylinder" shape, and "hairy." A.C. stated she could not move because she was "squished" against the refrigerator. When she tried to spit the object out of her mouth, defendant put it back in. A.C. recalled the object was in her mouth for approximately 30 seconds, and defendant removed it when she heard her mother coming down the stairs. Defendant did not say anything to A.C. after uncovering her eyes. A.C. stated defendant was only wearing underwear.

¶ 20        A.C. then went upstairs. Saige noticed A.C. looked uncomfortable and asked her what was wrong. At first, A.C. said she did not know, but she later told Saige what happened with defendant. A.C. stated it was hard for her to tell Saige "[b]ecause I didn't really know what happened" and it made her cry. A.C. testified defendant had never done this to her before.

¶ 21        The State offered into evidence two recorded forensic interviews of A.C. conducted by Tyler's Justice Center. In the first video, recorded on May 25, 2022, A.C. told the interviewer something had happened to her, but she did not want to talk about it. Later in the interview, A.C. provided more details about the incident. A.C. was in the kitchen looking for her hairbrush with defendant. A.C. did not see what happened because defendant covered her eyes with his hand. Defendant then opened A.C.'s mouth with his other hand. A.C. felt something warm on her tongue. She did not know what to call the object that was put in her mouth, but she thought it was a body part. A.C. stated she could not talk while the object was in her mouth "or else I might've ended up biting [defendant]."

¶ 22        In the second video, recorded on July 20, 2022, A.C. told the same interviewer that defendant put his hand on her face and she was "pretty sure he put something in my mouth." A.C. still did not know what the object was, but she described and drew a penis-shaped object on the easel in the interview room. She also described the object as "hairy" and said she felt something "slimy" in her mouth. A.C. recalled, when she tried to spit the object out, defendant pushed it back in her mouth.

¶ 23                    3. *Detective Tony Bradbury's Testimony*

¶ 24        Detective Tony Bradbury, a detective with the Freeport Police Department, testified he searched defendant's cell phone as part of the investigation. In the downloads folder on the phone, Detective Bradbury found two articles that were downloaded on May 14, 2022. The first

article was downloaded approximately 24 minutes after defendant left his home, and the second article was downloaded approximately an hour after he left the house. Copies of the two articles were admitted into evidence. The first article discussed "investigations for sexual assaults and specifically oral sexual assaults," including timelines for collecting DNA evidence. The second article was titled "Time Limits for Conducting a Forensic Examination: Can Biological Evidence be Recovered 24, 36, 48, 72, 84 or 96 Hours Following a Sexual Assault?"

¶ 25 Detective Bradbury testified he conducted a search of the Google account associated with defendant's phone. The records showed the account was registered to defendant's name. The records also showed the search history on defendant's account. On May 8, 2022, defendant searched for "sex doll" once and "small sex doll" twice. The records showed defendant visited a website displaying a sex doll that appeared to be a child with brown hair in pigtails and a yellow dress. The doll was between 65 and 100 centimeters tall and weighed around 35 pounds. Detective Bradbury explained the doll was "made for a person to engage in sexual intercourse with it." There was no evidence defendant ordered the sex doll. The searches and the link to the website were deleted from the phone the same day. Defense counsel objected to this evidence and the objection was overruled by the trial court. Defense counsel did not request a limiting instruction.

¶ 26 Detective Bradbury testified an oral swab was performed on A.C. as part of a sexual assault kit. The results showed no male DNA or sperm were detected. Bradbury stated he was not surprised by the result "because it was in the mouth."

¶ 27 4. *Defendant's Testimony*

¶ 28 Defendant testified on his own behalf. He admitted to searching for "sex dolls" and "small sex dolls" on May 8, 2022. Defendant explained he and his wife had previously discussed purchasing a sex doll. He further explained he searched for "small sex dolls" because they were

less expensive and easier to hide than a full-sized doll. Defendant stated he "[v]aguely" remembered looking at the sex doll in the picture the State showed to the jury. He denied it was his intent to look for a sex doll that appeared like a child. He also stated he did not purchase a sex doll and denied being attracted to children.

¶ 29    According to defendant, he woke up around 7:30 a.m. on May 14, 2022, and went downstairs to wake up Saige. He asked her if she wanted to go out for breakfast with the family. Defendant sat on the couch and scrolled on his cell phone while Saige took J.C. upstairs to get ready and A.C. looked for her hairbrush. He eventually got up to help A.C. look for her hairbrush. Defendant stated he was in the kitchen with A.C. for less than a minute, and nothing abnormal happened. He did not observe A.C. looking upset. A.C. then went upstairs, while defendant returned to sitting on the couch.

¶ 30    After 10 to 15 minutes, defendant called upstairs "to see what was taking so long." Saige came partway down the stairs and asked defendant what had happened. He stated he did not know what Saige was talking about and he was confused. After five more minutes passed, defendant went to the bottom of the stairs and called up again. Saige told him to stay downstairs, so defendant remained downstairs. After another five minutes passed, Saige came downstairs and said "that [A.C.] had told her that [defendant] had put something in her mouth." Defendant stated he was "extremely confused," and he denied telling Saige he would leave A.C. alone for the rest of her life. Saige told defendant she was taking A.C. to the hospital and asked defendant to leave the house.

¶ 31    Defendant left the house and went to his mother's home. He stated he was familiar with the two articles in the downloads folder on his phone because he searched for them. Defendant explained he searched for the articles because he understood what he was being accused of and he

was trying to understand what was going on. Defendant denied having inappropriate contact with A.C., covering her eyes with his hands, or putting his penis in her mouth.

¶ 32        On cross-examination, defendant acknowledged the sex doll appeared to look like a child. He recalled looking at the sex doll, but he did not buy it. The State asked defendant to compare a photograph of A.C. with the picture of the sex doll. Defendant acknowledged both A.C. and the sex doll had dark brown eyes and straight-across bangs, and both were "petite" and "little." He also admitted telling Saige he might have put his finger in A.C.'s mouth when Saige confronted him.

¶ 33        The State called Saige as a rebuttal witness. She acknowledged defendant asked her about purchasing a sex doll. Saige did not want a sex doll, but she gave defendant permission to purchase one when they had the money. She stated the sex doll would only be for defendant's use instead of having sex with her, and she did not plan on using it with him.

¶ 34        The jury found defendant guilty on counts I and II. Defendant did not file a posttrial motion.

¶ 35                                C. Sentencing

¶ 36        In July 2024, the trial court held a sentencing hearing. The court stated it received the presentence investigation report (PSI) and the sex offender evaluation. Defense counsel submitted three letters in support from defendant's family members. The State presented victim impact statements from A.C. and Saige.

¶ 37        The State recommended a sentence of 25 years' imprisonment. In aggravation, the State argued (1) defendant's conduct caused serious harm, (2) defendant held a position of trust over the victim, and (3) the sentence was necessary to deter others from committing the same crime. See 730 ILCS 5/5-5-3.2(a)(1), (7), (14) (West 2022). The State also mentioned section

5-5-3.2(a)(29) of the Unified Code of Corrections (*id.* § 5-5-3.2(a)(29)), which is the aggravating factor that applies in certain sex offense cases where the victim has an intellectual disability. However, the State made no argument that A.C. had an intellectual disability.

¶ 38        Defense counsel requested the minimum sentence of six years. In mitigation, defense counsel argued (1) defendant had no history of prior delinquency or criminal activity, (2) defendant's criminal conduct was a result of circumstances unlikely to recur, and (3) the character and attitude of defendant indicated he was unlikely to commit another crime. See *id.* § 5-5-3.1(a)(7), (8), (9). Counsel emphasized the sex offender evaluation found that a diagnosis of pedophilia was not appropriate and defendant was at a low risk to reoffend.

¶ 39        Defendant gave a statement in allocution. He maintained his innocence and denied he was capable of harming his children.

¶ 40        The trial court sentenced defendant to 18 years' imprisonment on count I. Pursuant to the one-act, one-crime rule, the court merged count II into count I. The court stated it considered the trial evidence; the PSI; the history, character, and attitude of defendant; the arguments of the parties; and the statutory factors in mitigation and aggravation. As to aggravation, the court found (1) defendant's conduct caused or threatened serious harm, (2) defendant held a position of trust over the victim, (3) the victim had an alleged intellectual disability, and (4) a sentence was necessary to deter others from committing the same offense. The court stated the "most aggravating thing" in the case was that the victim was defendant's daughter and he was trying to obtain sex dolls that resembled her. The court disagreed defendant was at a low risk of reoffending and stated it found defendant was "beyond narcissistic." As to mitigation, the court found defendant had no history of prior delinquency or criminal activity.

¶ 41        Defendant did not file a postsentencing motion.

¶ 42        This appeal followed.

¶ 43                              II. ANALYSIS

¶ 44        On appeal, defendant argues (1) his trial counsel rendered ineffective assistance for failing to request a limiting instruction related to the other-acts evidence introduced at trial and (2) the trial court erred by considering in aggravation A.C.'s alleged "intellectual disability" and her age when it sentenced defendant.

¶ 45                          A. Limiting Instruction

¶ 46        Defendant contends his trial counsel rendered ineffective assistance by failing to request a limiting instruction related to the other-acts evidence introduced at trial.

¶ 47        The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A claim of ineffective assistance of counsel is analyzed under the familiar test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). To prevail on an ineffective assistance claim, the defendant must show (1) deficient performance and (2) prejudice. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 48        As to deficient performance, the defendant must show his attorney's representation fell below an objective standard of reasonableness. *Id.* In other words, counsel's errors must be so serious that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Further, the defendant must overcome the strong presumption that counsel's action or inaction was the product of sound trial strategy. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998).

¶ 49        As to prejudice, the defendant must demonstrate a reasonable probability exists, but for counsel's errors, the result of the proceedings would have been different. *People v. Domagala*,

2013 IL 113688, ¶ 36. A "reasonable probability" has been defined as a probability sufficient to undermine confidence in the outcome of the trial. (Internal quotation marks omitted.) *Peterson*, 2017 IL 120331, ¶ 79. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. We review *de novo* whether a defendant was denied the effective assistance of counsel. *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 50        Here, defendant does not argue that a valid basis for admitting the other-acts evidence was lacking. Rather, he maintains trial counsel was ineffective for failing to request Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved October 17, 2014) (hereinafter IPI Criminal No. 3.14) be given to the jury at the end of the trial. Generally, "evidence indicating that a defendant committed prior bad acts is improper where its purpose is to demonstrate the defendant's propensity to commit crime." *People v. Davis*, 260 Ill. App. 3d 176, 190 (1994). This evidence, often referred to as "other-crimes evidence" or "other-acts evidence," is admissible only when relevant "to show *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime with which the defendant is charged." *People v. Pikes*, 2013 IL 115171, ¶ 11. "[O]ther crimes evidence may include acts which may not be a criminal offense." *Davis*, 260 Ill. App. 3d at 190. Although the committee note to IPI Criminal No 3.14 recommends the instruction be given both from the bench when the other-acts evidence is introduced and at the end of trial (IPI Crim. No. 3.14, Committee Note), it is ultimately defense counsel's strategic decision whether to request the instruction. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52.

¶ 51        We first address whether defense counsel's decision to forgo a limiting instruction constituted deficient performance. As stated above, matters relating to trial strategy are mostly immune from claims of ineffective assistance of counsel. *People v. Pecoraro*, 175 Ill. 2d 294, 319-20 (1997). The decision to forgo requesting a limiting instruction as to a defendant's other bad acts

has been found to be a reasonable trial strategy that will not support an ineffective assistance of counsel claim. See *Peel*, 2018 IL App (4th) 160100, ¶ 52 ("The decision to not request a limiting instruction may have been trial strategy in order to avoid drawing undue attention to the other-crimes evidence."); *People v. Jackson*, 391 Ill. App. 3d 11, 34 (2009) ("Defense counsel's choice not to seek a limiting instruction regarding other crimes evidence was purely a strategic decision made so as not to emphasize the evidence which, while proper, portrayed defendant in a bad light.").

¶ 52         In the present case, it was similarly a strategic decision by defense counsel to forgo a limiting instruction and instead have defendant testify to offer an alternative explanation for his conduct. At trial, defendant testified he searched for a "small sex doll" because it was more affordable and easier to hide in the closet than a full-size doll. He also explained the sex doll was for sexual activities with Saige. Additionally, Saige testified she knew defendant was looking to purchase a sex doll, though she disputed she would use the sex doll with him. By offering a limiting instruction for the other-acts evidence, counsel risked portraying defendant's otherwise legal conduct as "bad," which would conflict with his explanation that the sex doll was for consensual activities with Saige. Therefore, defendant is unable to establish deficient performance in the strategic decision to forgo a limiting instruction.

¶ 53         Even if we assume, *arguendo*, counsel provided ineffective assistance, defendant cannot establish a reasonable probability the result of the proceedings would have been different had the jury been given the limiting instruction concerning the other-acts evidence. Importantly, defendant does not challenge the basis for admitting the sex doll evidence to prove intent. Thus, a new jury would still hear the sex doll evidence and be allowed to consider it for the purpose of intent. Moreover, even without the sex doll evidence, the trial record strongly supports a finding

of guilt. Saige testified, when she confronted defendant about the incident, he told her he may have "accidentally" put his finger in A.C.'s mouth. Defendant admitted to telling Saige this when he testified. Police also recovered two articles downloaded to defendant's cell phone shortly after he left the house, both relating to the collection of evidence following a sexual assault or oral sexual assault. Defendant also admitted to searching for these articles when he testified. Finally, and most significantly, A.C. provided a detailed recounting of the sexual assault in two recorded interviews and at trial. The fact A.C. possessed this age-inappropriate sexual knowledge, which she experienced at the hands of defendant, creates an overwhelming inference of guilt. Accordingly, defendant has failed to prove he was denied the effective assistance of counsel.

¶ 54                                    B. Improper Factors

¶ 55        Defendant next challenges the trial court's consideration of two aggravating factors at sentencing. Specifically, he argues the court erred by considering in aggravation A.C.'s alleged "intellectual disability" and her age.

¶ 56        Defendant acknowledges he forfeited this argument but requests first-prong plain error review. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). We agree defendant forfeited this issue by failing to raise it in a postsentencing motion. See *People v. Martin*, 119 Ill. 2d 453, 458 (1988). Under the plain error doctrine, this court may review an unpreserved issue on appeal when "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step in this analysis is to determine whether a clear or obvious error occurred. *Id.* Accordingly, we will first determine whether defendant's claim constitutes clear or obvious error.

¶ 57        In discussing the applicable factors in aggravation at sentencing, the trial court stated, in part, the following:

"But a victim with an intellectual disability. A 7-year-old girl is just starting to advance from being a young child to becoming a young girl. As sharp as she was in the interview stage and when she took the stand, she is still a child. She does not have, as high as her intellect may be, the ability to understand, and I do believe that Factor in Aggravation No. 29 does apply."

¶ 58       We first address the trial court's consideration of A.C.'s age. "A 'double enhancement' refers to the use of a single factor that is implicit in the offense for which the defendant was convicted as an aggravating factor in sentencing for that offense." *People v. Dixon*, 359 Ill. App. 3d 938, 945 (2005). Generally, a double enhancement is prohibited because courts assume "that the legislature has already considered the aggravating factor in setting the penalty range for the charged offense." *People v. Shaw-Sodaro*, 2023 IL App (4th) 220704, ¶ 67. "Whether the trial court relied upon an improper factor at sentencing is a question of law reviewed *de novo*." *Hibbler*, 2019 IL App (4th) 160897, ¶ 65.

¶ 59       At sentencing, the trial court may consider many relevant factors, such as "the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986). For example, the court may properly consider the degree of harm caused to a victim, even in cases where serious bodily harm is arguably an inherent element of the offense. *Id.* at 269. Similarly, "[i]n cases where the victim's age is an element of the offense, the court does not err simply by mentioning the victim's age at sentencing, as it is relevant to the nature of the case." *People v. Raney*, 2014 IL App (4th) 130551, ¶ 35 (citing *People v. Thurmond*, 317 Ill. App. 3d 1133, 1144 (2000)).

¶ 60       To the extent the trial court considered A.C.'s age, this was not error. First, it is not

entirely clear from the record that the court considered A.C.'s age as an aggravating factor. When taking the court's comments in context, it appears the court discussed A.C.'s age as it pertained to her intellectual capacity, rather than as an independent aggravating factor. See *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22 ("There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court.").

¶ 61    Even if the trial court used A.C.'s age as an aggravating factor, this does not automatically constitute error. In *Thurmond*, the reviewing court stated, when age is an element of the crime, the sentencing court can properly consider whether the victim is particularly young. *Thurmond*, 317 Ill. App. 3d at 1144. The court reasoned, "[T]here is a difference between being under age 18 and being significantly under age 18. For example, while an act of sexual penetration on a 17-year-old family member is reprehensible ***, an act of sexual penetration on a 7-year-old family member is even more reprehensible." *Id.* In this case, defendant was convicted of predatory criminal sexual assault of a child under section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2022)) for committing sexual assault on a person 13 years of age or younger. The court in this case could have concluded the victim, who was 7 years old, was of an age significantly younger than 13. Therefore, the court did not err by mentioning the victim's age at sentencing.

¶ 62    However, we agree with defendant and the State that the trial court's consideration of A.C.'s alleged "intellectual disability" was error. First, this aggravating factor only applies in cases where the defendant has committed criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse, or aggravated criminal sexual abuse. 730 ILCS 5/5-5-3.2(a)(29)

(West 2022). Although defendant was convicted of criminal sexual abuse, this conviction merged into his conviction for predatory criminal sexual assault of a child. Second, no evidence was presented at trial or at sentencing that A.C. had an intellectual disability. *See id.* § 5-5-3.2(a) (defining "intellectual disability" as "significantly subaverage intellectual functioning which exists concurrently with impairment in adaptive behavior"). Therefore, the court erred by relying on this factor.

¶ 63        Nevertheless, when a trial court considers an improper factor, a remand is not required if "it appears from the record that the weight placed upon the improper factor was so insignificant that it did not lead to a greater sentence." *People v. Dowding*, 388 Ill. App. 3d 936, 945 (2009). "To obtain a remand for resentencing, *** [the] defendant must show more than the mere mentioning of an improper fact." *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). The reviewing court should consider "(1) whether the trial court made any dismissive or emphatic comments in reciting its consideration of the improper factor" and "(2) whether the sentence received was substantially less than the maximum sentence permissible by statute." *Dowding*, 388 Ill. App. 3d at 945.

¶ 64        In the present case, there is no indication in the record that the trial court placed significant weight on the intellectual disability factor when sentencing defendant. Aside from the brief mention of the improper factor when discussing the victim's young age, the court found several aggravating factors applied in defendant's case, including that his conduct caused serious harm and "lifelong damage" to the victim, defendant held a position of authority over the victim, and the sentence was necessary to deter others. Notably, the court explicitly stated the "most aggravating" factors were that A.C. was defendant's daughter and defendant tried to obtain a sex doll that resembled her. The only applicable mitigating factor identified by the court was that

defendant had no history of delinquency or criminal activity. The court also disagreed with the sex offender evaluation's conclusion that defendant was at low risk for reoffending, based on its observation that defendant was "beyond narcissistic" and his criminal conduct was "premeditated" and "calculated." Thus, given the overwhelming aggravating factors in this case, the court's fleeting reference to A.C.'s alleged "intellectual disability" was insignificant and did not lead to a greater sentence.

¶ 65 Although the State mentioned the intellectual disability factor at sentencing, it made no argument as to whether A.C. had an intellectual disability. In fact, the State never uttered the phrase "intellectual disability." The State briefly mentioned the improper factor one time, arguing, "Paragraphs 14 and 29 are of similar vain [*sic*], that the defendant committed the offense of criminal sexual assault and had a position of trust or supervision in relation to the victim." The remainder of the State's argument as to these two factors related to defendant and the victim's relationship as father-daughter. If anything, it appears the State's single reference to the intellectual disability factor was in error.

¶ 66 Ultimately, defendant was sentenced to 18 years' imprisonment—three times higher than the statutory minimum but 42 years below the statutory maximum. Further, the trial court rejected the State's recommendation of 25 years' imprisonment and gave defendant a lesser sentence. The nature and circumstances of the offense, in addition to the multitude of aggravating factors in this case, more than justify defendant's 18-year sentence. Based on the record before us, we find any weight the court may have placed on the improper factor "was so insignificant that it did not lead to a greater sentence." *Id.* Therefore, a remand for a new sentencing hearing is not required. Because we find no clear or obvious error occurred at sentencing, we decline to apply the plain error doctrine.

¶ 67        Alternatively, defendant argues his trial counsel provided ineffective assistance by failing to object to the trial court's consideration of the alleged improper sentencing factors. As we have found the court's consideration of A.C.'s age was proper and its consideration of the intellectual disability factor was so insignificant that it did not affect the sentence, counsel's failure to object did not constitute ineffective assistance. See *People v. Baker*, 2022 IL App (4th) 210713, ¶ 75 ("Because we find no error, defendant cannot establish either the occurrence of plain error or ineffective assistance of counsel.").

¶ 68                                III. CONCLUSION

¶ 69        For the reasons stated, we affirm the trial court's judgment.

¶ 70        Affirmed.